Joseph P. McCULLOUGH, Robert Flipping, III, and Arthur Snellbaker, Plaintiffs,

v.

CITY OF ATLANTIC CITY, James Dintono, individually and as Chief of Police, George D. Pugh, individually and as Director of Public Safety, James Whelan, individually and as Mayor of Atlantic City, Jane and John Does 1–10, Defendants.

No. CIV. 99–738(SSB).

United States District Court, D. New Jersey.

March 21, 2001.

Louis M. Barbone, Jacobs & Barbone, Atlantic City, NJ, for Plaintiffs Joseph B. McCullough, Robert Flipping, III, and Arthur Snellbaker.

Karen M. Williams, Jasinski and Paranac, P.C., Newark, NJ, for Defendant City of Atlantic City.

Scott D. Sherwood, Law Offices of Joseph Rodgers, Linwood, NJ, for Defendant James DiNoto.

Beverly M. Wurth, Savage & Serio, P.A. East Rutherford, NJ, for Defendant George D. Pugh.

## OPINION REGARDING DEFENDANT CITY OF ATLANTIC CITY'S MOTION FOR SUMMARY JUDGMENT and DEFENDANT PUGH'S MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before this Court, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1446(a) (removal statute) are motions for summary judgment by Defendant City of Atlantic City ("Atlantic City") and Defendant George D. Pugh ("Pugh"). *See* Docket Entry at 21 & 24. Defendant James DiNoto ("DiNoto") joins in Atlantic City's motion. *See* Docket Entry at 19. Defendant Pugh joins in Atlantic City's Reply Brief. *See* Letter to Magistrate Judge Kugler, dated October 11, 2000. Pursuant to Fed. R. Civ. Proc. 78, the Court is deciding these motions without oral argument. For the reasons stated below, Atlantic City's Motion for Summary Judgment and Defendant Pugh's Motion for Summary Judgment will be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Atlantic City Police Department ("ACPD") is a civil service police department. *See* Atlantic City's Stmt. Mat. Facts ("City's Facts") at 1. After learning that former Police Chief Nicholas Rifice ("Chief Rifice") planned to retire, Atlantic City Mayor, James Whelan, decided to replace the position of Chief of Police with a Director of Public Safety. *See id.* at ¶ 2. The City Council of Atlantic City approved this decision to eliminate the Chief of Police position and have the Director of Public Safety run the ACPD.

Defendant Pugh began working for Atlantic City on or about January 1, 1997. *See* Karen M. Williams Cert. at Exh. E, George D. Pugh Dep. Test. at 75.12–75.15. Initially, he was working out of a vacancy in the Mayor's office to facilitate an orderly transition from Chief Rifice to Director Pugh. *See* City's Facts at ¶ 3. On or about March 1, 1997, Chief Rifice retired and Defendant Pugh officially assumed the position of Director of Public Safety. *See* Karen M. Williams Cert. at Exh. E, Pugh Dep. Test. at 75.11.

In March 1997, the City Council reversed its earlier decision and restored the position of Chief of Police. Mayor Whelan met with Director Pugh and Andrew Mair, Business Administrator for the City, and asked for their recommendations for a temporary acting Chief of Police. Five Police Inspectors, including Plaintiff Snellbaker and Defendant DiNoto, were considered for the Chief of Police position. Director Pugh recommended then Inspector

DiNoto. Mayor Whelan appointed DiNoto Chief of Police on March 13, 1997. *See* City's Facts at ¶ 7. DiNoto's appointment stirred negativity from other Inspectors. *See id.* Inspector Snellbaker stated that he did not think any of the inspectors had any animus toward [DiNoto], but that animus was directed toward Pugh. *See* Pl. Appendix II at Exh. K, Arthur C. Snellbaker Dep. Test. at 182.25–183.02.

## A. SPECIFIC FACTUAL ALLEGATIONS OF JOSEPH B. McCULLOUGH

Joseph B. McCullough ("McCullough") is the Captain of the Uniform Patrol Shift, 4:00 p.m. until Midnight, known as the "Bravo Platoon." *See* Pl. Stmt. Mat. Facts ("Pl.Facts") at ¶ 20. McCullough contends that DiNoto has had a long-standing personal animus against McCullough for the following reasons:

(1) In 1996, McCullough had filed an independent Complaint pursuant to 42 U.S.C. § 1983 against Defendant Atlantic City and others. *See* Compl. at ¶ 14. This claim was ultimately settled and resulted in McCullough's promotion to the position of Captain. In that lawsuit, McCullough testified as to a personal animus existing between himself and Defendant DiNoto arising out of a romantic relationship between DiNoto and McCullough's ex-mother-in-law. *See* Pl. Facts at ¶ 16a.

(2) McCullough had testified in the trial of a fellow officer's race discrimination lawsuit filed against Defendant Atlantic City regarding racial statements, differential treatment, and other matters involving the ACPD in *Anderson v. City of Atlantic City.* *See id.* at ¶ 16b.

(3) McCullough had reported through the chain of command that a shortage of officers on the Bravo Patrol unit was dangerously deficient for the protection of the citizens of Atlantic City. *See id.* at ¶ 16c.

(4) McCullough was listed as a witness in *Schwartz v. Atlantic City Police Department, et al.,* which involve similar, if not identical, claims, and is currently pending before the Superior Court of New Jersey, Law Division, Atlantic County, in Atlantic City. DiNoto and Atlantic City are also named defendants. *See id.* at ¶ 8, ¶ 9 & ¶ 16d.

McCullough claims that DiNoto's animus against McCullough resulted in his transfer from Inspector to the position of Station House Commander ("SHC").

Defendants contend that the SHC position was instituted to address the changes needed by the relocation of the ACPD to a new public safety building. *See* City's Facts at ¶ 32. The jail in the new building was substantially larger than the previous jail and would serve more functions. *See id.* at ¶ 33. Director Pugh and DiNoto had ongoing discussions about instituting the SHC position after moving into the new building. Pugh felt the position was necessary and that its refinement would be an ongoing process. *See id.* at ¶ 35. His support of the position was based on his previous experience utilizing an equivalent office in a considerably smaller facility, as well as in response to an attack that had been made on an officer by a prisoner in the jail when the Sergeant who was supposed to be on duty was absent. *See* Pl. Appendix II, Pugh Dep. Test. at 144.10–144.12 & 145.08–145.09. DiNoto instituted the SHC position. *See* City's Facts at ¶ 38.

A number of captains were considered for the SHC position. Pugh felt that the best candidates were those who were concerned about their duties and responsibilities and could provide well-written reports and make suggestions for improvements.

*See* id. at ¶ 42. Based on these criteria, McCullough, Flipping, and others were considered, and DiNoto made the final decision to assign McCullough and Flipping to the SHC positions on or about May 21, 1998. *See* id. at ¶ 43.

In a nine-page, single-spaced memorandum, dated June 16, 1998, from DiNoto to McCullough, DiNoto outlined the purposes and expectations of the SHC position. *See* Cert. of Karen M. Williams at Exh. CC.

McCullough claims that the SHC assignment was devoid of any responsibilities and resulted in McCullough being relieved of a command position. He contends that the SHC position included menial tasks and his only duty was to "sit in a chair, looking into a toilet." *See* id. at ¶ 33. Other than a telephone and a chair, the office of the SHC had no furniture. The office was a jail cell, which had to be accessed by a jail key, and had a toilet in the middle of the office and was known around the Department as the "Shit House Commander." *See* id.

McCullough contends that his transfer to the SHC position caused him to lose a three percent pay differential and required that he wear a different class of uniform. *See* Pl. Facts at ¶ 32. Furthermore, McCullough claims he was forced to use a disproportionate amount of sick time due to continued harassment and retaliation, and that the assignment caused him embarrassment and humiliation. *See* id. He also claims he was the target of special investigations.

The SHC position was eliminated within days of DiNoto retiring and Chief Benjamin Polk taking command. *See* Pl. Facts at ¶ 34.

## B. SPECIFIC FACTUAL ALLEGATIONS OF ROBERT FLIPPING, III

Robert Flipping, III ("Flipping") is the Captain of General Investigations, 4 p.m.

to Midnight, the Bravo Platoon. *See* Pl. Facts at ¶ 38. Flipping asserts that he was retaliated against based upon the following items:

(1) Flipping had reported through the chain of command that a shortage of officers on the Bravo detective unit was dangerously insufficient and could not accomplish the functions for which they were established. *See* Pl. Facts at ¶ 17a.

(2) He had testified in the criminal trial, *State v. Munoz,* where he gave truthful testimony that was embarrassing to the ACPD, particularly to DiNoto, who was the head of the Intelligence Unit at that time. *See* Pl. Facts at ¶ 17b.

(3) Flipping provided testimony that was harmful to DiNoto and the ACPD in the civil matter of *Hurley v. Atlantic City, et al. See* Pl. Facts at ¶ 17c.

(4) He acted as McCullough's Police Benevolent Association ("PBA") representative in *Anderson.*

(5) Flipping had documented through the chain of command numerous writings regarding DiNoto's personal animus against him. *See* Pl. Facts at ¶ 17e.

Flipping was also transferred to the position of SHC, and contends that the lack of duties equated to a demotion from his Sergeant's position. *See* Pl. Facts at ¶ 45. Flipping claims similar damages as McCullough, including being the target of investigations ordered by DiNoto. *See* Pl. Facts at ¶ 41, ¶ 50.

## C. SPECIFIC FACTUAL ALLEGATIONS OF ARTHUR SNELLBAKER

Arthur Snellbaker ("Snellbaker") is an Inspector at the ACPD and asserts similar

charges of retaliatory conduct against him, for reasons such as: 1) giving deposition testimony in the *Hurley* matter; 2) discussing concerns regarding possible Occupational Safety and Health Administration ("OSHA") violations in the old Public Safety Building and bringing these concerns to the attention of DiNoto, and his predecessor, through the chain of command; 3) vocally criticizing the Mayor and his administration for attempting to eliminate the position of Chief of Police; 4) vocally criticizing Pugh; and 5) being a viable challenger for the Chief of Police position, along with DiNoto. *See* Pl. Fact at ¶ 54–59; Compl. at ¶ 16.

On July 29, 1997, Snellbaker was transferred to a position called Duty Officer ("DO"). The Duty Officer/Commander position was instituted to address complaints made by members of the City Council and community groups, that there were no command level police personnel working the 4:00 p.m. to 12:00 a.m., Bravo shift, and the 12:00 a.m. to 8:00 a.m., "Charlie" shift. *See* City's Facts at ¶ 8. Prior to the reinstatement of the Chief of Police, Director Pugh met with the five Inspectors to broach the idea of having them assigned around the clock. *See* City's Facts at ¶ 9. Only DiNoto was receptive to the idea and admitted there might be a need for command level personnel on the Bravo and Charlie shifts. *See* City's Facts at ¶ 9. After DiNoto was assigned Temporary Police Chief, DiNoto instituted the plan that was already laid out by Director Pugh for the DO position. DiNoto made his decision as to who would be assigned to the DO positions by a process of elimination: one inspector was assigned to be in charge of the Patrol and Detectives Bureau because of his hands-on approach, another was not considered because of his seniority. *See* City's Facts at ¶ 12. That left Snellbaker and another inspector. Because Snellbaker had more seniority, DiNoto assigned him to the generally more-

preferable 4:00 p.m. to 12:00 a.m. shift. *See* id.

Snellbaker contends that his reassignment to the DO position left him with a "nothing job . . ., with no office, no furniture, no command, no responsibilities." *See* Pl. Facts at ¶ 68. He contends that the job was not commensurate with his rank, that he had no command, and he could not get a clear delineation of his purported duties. *See* id. Snellbaker requested that the New Jersey Department of Personnel perform a desk audit on the DO position to determine if his assignment was consistent with the State's job description for Inspector. *See* City's Facts at ¶ 22. The Department determined that the DO assignment was consistent with an inspector's duties pursuant to the State's job description.

DiNoto ordered that DO's complete two Customer Satisfaction Surveys per shift. Snellbaker initially assigned this responsibility to a Sergeant. *See* City's Facts at ¶ 24. Upon Snellbaker's failure to regularly complete the Surveys, DiNoto filed disciplinary charges against Snellbaker. *See* id. at ¶ 25. Snellbaker testified that he believed that the disciplinary charges resulted from "a misunderstanding between [DiNoto] and [Snellbaker], between [DiNoto's] desires and [Snellbaker's] interpretation of what [he] was supposed to do." *See* id. at ¶ 26.

When Snellbaker was brought up on charges of insubordination for failing to comply with DiNoto's orders, Pugh sat as a hearing officer and found Snellbaker guilty of modified charges. *See* Pl. Facts at 65. Snellbaker described a memorandum he had written to DiNoto, as "ill-advised in the language" but Snellbaker was "disinclined to condemn [himself] by saying [the memo is] insubordinate." *See* Pl. Appendix II at Exh.K, Snellbaker Dep. Test. at 172.22 173.24. Snellbaker further

stated that he had never received a memo with the same tone and language from any of his own subordinates, and if he had, he may have taken disciplinary action himself, "depend[ing] upon the justification for it and what the individual was thinking." *See* id.

As a result of being found guilty on disciplinary charges, Snellbaker claims damages of suffering from a ten day suspension, losing five days of pay, and being fined for the amount of overtime he put in during the pendency of his hearing. *See* Pl. Facts at ¶ 56. Like McCullough, and Flipping, Snellbaker claims he was forced to take disproportionate sick time, suffered from stress and humiliation as a result of the harassment against him, and was the target of a special investigation. *See* id. at ¶¶ 71–72, ¶ 67.

On October 1, 1998, DiNoto retired as Chief of Police. By Personnel Order 122, dated October 5, 1998, Snellbaker was transferred out of the DO position, and McCullough and Flipping were transferred out of the SHC position. *See* City's Facts at ¶ 30 & ¶ 29. With the retirement of DiNoto and another inspector, as well as the promotion of Inspector Polk to Chief of Police, it was no longer feasible to have the inspectors as DO's. *See* City's Facts at ¶ 47. The position of DO was eliminated by Chief Benjamin Polk within five (5) days of DiNoto's retirement. *See* Pl. Facts at ¶ 74.

On or about November 18, 1998, Plaintiffs McCullough, Flipping, and Snellbaker filed a two count Complaint in the Superior Court of New Jersey, Law Division, Atlantic County, alleging causes of action pursuant to 42 U.S.C. § 1983 (" § 1983") and New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq.* ("CEPA"). On or about February 16, 1999, Atlantic City filed a Notice of Removal to the United States District Court for the District of New Jersey. On Febru-

ary 23, 2000, Mayor Whelan, individually and as Mayor of Atlantic City, was dismissed without prejudice as a defendant in this action by a voluntary stipulation of dismissal. *See* Docket Entry at 14.

Plaintiffs allege that Defendants individually and collectively planned and implemented a series of personnel and administrative actions to punish and unlawfully retaliate against the Plaintiffs. *See* Compl. at ¶¶ 12–13. These actions included transfer, reassignment, reconstitution of job descriptions, and placements of Plaintiffs into meaningless and inferior job positions. *See* id. at ¶ 12. Plaintiffs contend that these actions violated their First and Fourteenth Amendment rights in contravention to § 1983 and violated New Jersey's CEPA.

## II. STANDARD FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.,* 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. National West-*

*minster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or . . . vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

### A. CLAIMS PURSUANT TO 42 U.S.C. § 1983

42 U.S.C. § 1983 [1] provides a remedy for individuals whose Federal Constitutional rights have been violated by persons or entities acting under the color of state law. *See McCusker v. City of Atlantic City,* 959 F.Supp. 669, 671 (D.N.J.1996). To prevail under § 1983, a plaintiff must show: (1) a violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation

was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted).

The parties have not disputed that for the purposes of this motion, the complained-of conduct was allegedly committed by state actors acting under the color of state law. Defendants instead argue that the § 1983 claims fail because Plaintiffs cannot show an underlying Constitutional violation. In response, Plaintiffs contend that they have alleged violations of both the Fourteenth Amendment's Substantive Due Process Clause and the First Amendment, which entitle them to redress under § 1983.

### 1. Fourteenth Amendment Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has found that in addition to requiring adequate state procedures, the clause has a substantive component. *Nicholas v. Pennsylvania State University,* 227 F.3d 133, 139 (3d Cir.2000) (citing *Planned Parenthood of S.E. Pennsylvania v. Casey,* 505 U.S. 833, 846–47, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (internal quotation omitted)).

"The substantive component of the Due Process Clause limits what governments may do regardless of the fairness of procedures that it employs, and covers government conduct in both legislative and executive capacities." *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 399

---

1. § 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

(3d Cir.2000). A property interest that is protected by the Fourteenth Amendment's Due Process Clause may not be taken away by the state for reasons that are "arbitrary, irrational, or tainted by improper motive," *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 124 (3d Cir. 2000) (quoting *Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.1988)), or by means that "shock the contemporary conscience." *Boyanowski,* 215 F.3d at 401 (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

To prevail on their substantive due process claim, Plaintiffs "must establish as a threshold matter that [they have] a protected property interest to which the Fourteenth Amendment's due process protection applies." *See Nicholas,* 227 F.3d at 139–40 (quoting *Woodwind Estates,* 205 F.3d at 123).[2] Not all property interests entitled to procedural due process protection are protected by the substantive due process clause. *Id.* at 140 (quotation omitted). "While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring). Thus, whether the property interest falls under the ambit of substantive due process protection "depends on whether that interest is 'fundamental' under the United States Constitution." *See Nicholas,* 227 F.3d at 140 (citations omitted).

If the property interest is "fundamental" under the Constitution, "then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not 'fundamental,' however, the governmental action is entirely outside the ambit of substantive due process and will be upheld so long as the state satisfies the requirements of procedural due process." *Nicholas,* 227 F.3d at 139–40.

Here, Plaintiffs contend that Defendants' conduct resulted in the loss of Plaintiffs' property interests, which include certain pay and benefits. *See* Pl. Resp. at 15. The loss of pay refers to a three percent pay differential, five days of pay, and various fines.

 The three percent pay differential is essentially a clothing allowance provided for in Plaintiffs' collective bargaining agreement ("CBA"). The CBA provides that employees assigned to a detective bureau or other plain-clothes unit will receive a three percent differential for clothing. *See* City's Facts at ¶ 61. The CBA further provides that when an employee returns to uniform duty, that employee no longer receives that differential. *See id.* at ¶ 62. A transfer to a position that does not receive the three percent differential does not amount to a "loss in pay" as Plaintiffs so characterize, because those monies are presumably provided to offset the cost of additional clothing an employee would purchase if on plain-clothes duty. The three percent differential resembles a "reimbursement" more than additional pay or a bonus. As such, the Court finds that a transfer resulting in the discontinuation of

---

**2.** *Nicholas* distinguishes between a substantive due process claim where a plaintiff challenges the validity of a legislative act, and a substantive due process claim that protects against certain types of non-legislative state action. *See* 227 F.3d at 139. The Court applies the standard set forth in *Nicholas* for non-legislative state action, which is at issue here.

the three percent differential is not an injury or an adverse employment action where that employee is moved to uniform duty and no longer entitled to that differential. Thus, in reviewing Plaintiffs' claim for the deprivation of their property interests in violation of the Fourteenth Amendment, the Court will consider the following alleged injuries: (1) loss of five days of pay; (2) monies associated with the payment of fines; (3) having to take disproportionate sick time; and (4) stress and humiliation associated with the constructive demotion, having to wear a different uniform, and the like.

In *Nicholas*, the Third Circuit held that tenured public employment is not a fundamental property interest entitled to substantive due process protection. 227 F.3d at 142. If tenured employment is not entitled to substantive due process protection, certainly the damages Plaintiffs claim do not fall under the ambit of property or liberty interests afforded substantive due process protection. As the Supreme Court stated:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error.... The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Bishop v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Because Plaintiffs failed to claim an interest protected by the Fourteenth Amendment's Substantive Due Process Clause, that claim will be dismissed.

### 2. First Amendment Retaliation Claim

The First Amendment protects statements by public officials on matters of public concern. *See Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "[T]he Supreme Court has sought to prevent 'a State [from] condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' " *Zamboni v. Stamler*, 847 F.2d 73, 76–77 (3d Cir.1988) (quoting *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "On the other hand, because the state may have an interest as an employer in regulating the speech of its employees, the judicial task is to strike a 'balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Zamboni*, 847 F.2d at 77 (3d Cir.1988) (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).

Unlike Fourteenth Amendment due process rights, the First Amendment right to be free from retaliation is not defeated by the lack of a property or liberty interest in a plaintiff's employment. *Latessa v. New Jersey Racing Commission*, 113 F.3d 1313, 1319 (3d Cir.1997) (citations omitted). A public employee's claim of retaliation for a protected activity, here speech, is analyzed in three steps. *Id.* (citing *Green v. Philadelphia Housing Authority*, 105 F.3d 882, 885 (3d Cir.1997); *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir.1996); *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir.1995)). First, the plaintiff must demonstrate that his speech was protected. *Id.* (citing *Green*, 105 F.3d at 885). Second, the plaintiff must show that the

speech was a motivating factor for the alleged adverse retaliatory action. *Id.* Third, a defendant may defeat the plaintiff's claim by establishing that the adverse action would have been taken even in the absence of the protected speech. *Id.*

### a. Whether the Speech Was Protected

█ In order to be protected, the speech in question must be on a matter of public concern. *See Connick,* 461 U.S. at 142, 103 S.Ct. 1684; *Green,* 105 F.3d at 885. Speech by an employee that is on a matter of public concern is distinguished from speech upon matters of only personal interest "because when a public employee speaks 'upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum' for review." *Zamboni,* 847 F.2d at 77 (quoting *Connick,* 461 U.S. at 146–147, 103 S.Ct. 1684); *see also Swineford v. Snyder County,* 15 F.3d 1258, 1270 (3d Cir.1994).

If the speech is on a matter of public concern, the Court must perform a balancing test before concluding that the speech is protected. The public interest favoring the expression "must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees." *Green,* 105 F.3d at 885 (quoting *Watters,* 55 F.3d at 892). If the public interest favoring the speech is outweighed by the possible injury, the expression is not protected.

A public employee's speech involves a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Green,* 105 F.3d at 885–86 (citations omitted). This determination turns on the content, form and context of the public employee's speech. *See Con-*

*nick* 461 U.S. at 147–48 & n. 7, 103 S.Ct. 1684; *Green,* 105 F.3d at 885.

In *Pro v. Donatucci,* the Third Circuit held that a public employee's court appearance in response to a subpoena is a matter of public concern, regardless of the content of the expression. 81 F.3d at 1291. *Green v. Philadelphia Housing Authority* expanded *Pro*'s holding and found that a public employee's *voluntary* appearance in court is a matter of public concern, regardless of the content of the expression. *See Green,* 105 F.3d at 886 (emphasis added). In its determination, the Third Circuit sought guidance from the Fifth Circuit, which observed:

When an employee testifies before an official governmental adjudicatory or factfinding body he speaks in a context that is inherently of public concern. Our judicial system is designed to resolve disputes, to right wrongs. We encourage uninhibited testimony, under penalty of perjury, in an attempt to arrive at the truth. We would compromise the integrity of the judicial process if we tolerated state retaliation for testimony that is damaging to the state.

*Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir.1989).

The concerns in *Johnston* are implicated here, where a court, or courts, depend on the accurate testimony by those familiar with the facts of the case, to effectuate justice. "The utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony at proceedings. Not only would 'the first amendment right of the witness be infringed by this type of coercion, the judicial interest in attempting to resolve disputes by arriving at the truth would be in jeopardy.'" *Green* 105 F.3d at 887. "Furthermore, a witness who succumbed to any real or

imagined coercion could also be subject to a charge of perjury." *Id.* (quoting *Reeves v. Claiborne County Bd. of Educ.*, 828 F.2d 1096, 1100 (5th Cir.1987)).

In the case at hand, at least some of the speech that each Plaintiff contends led to retaliatory action is speech of a public concern. Clearly, speech alleging OSHA violations and speech requesting more police resources or complaining about the lack of police resources, involve matters of a public concern, because the content of such speech is integrally tied to the health and safety of the community. Furthermore, the testimonies Plaintiffs provided in *Anderson v. City of Atlantic City, Hurley v. Atlantic City Police Department,*[3] *State v. Munoz,* and/or any other judicial proceeding are automatically of a public concern because, as in *Green,* they implicate the judicial and public interest in the integrity of the truth seeking process and the effective administration of justice.

On the other hand, speech implicating only personal concern is not protected. For instance, Flipping's documentation of DiNoto's personal animus against Flipping would not be protected unless that animus relates to or implicates political, social, or community interests. Being a "viable challenger for the Chief of Police position" also does not amount to protected conduct or expression protected from First Amendment retaliation.

Insofar as Defendants have not alleged that Plaintiffs' speech caused any interference with the effective functioning of Atlantic City or the ACPD, the Plaintiffs' have shown that at least some of the speech that allegedly led to retaliatory conduct is protected.

### b. Whether the Speech Was a Motivating Factor

█ Plaintiffs also bear the burden of showing that their constitutionally protected conduct was a "substantial" or "motivating factor" in the relevant retaliatory decision. *See Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000) (citing *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). "Once the plaintiff carries this burden, the burden shifts to the defendant to show 'by the preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" *Id.* (quoting *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. 568).

Defendants argue that Plaintiffs fail to bring forth evidence that their speech was a motivating factor in their transfers. Defendants contend that the passage of time between the protected acts of expression and transfers refutes any inference of retaliation: McCullough's civil rights case was settled twenty (20) months before he was transferred to the SHC position; Flipping had provided testimony in *Munoz* in 1991, but was not transferred to the SHC position until May 21, 1998; and Snellbaker was transferred to the DO position on July 29, 1997, well after the 1996 conclusion of all testimony in *Hurley.*

In addition, Defendants dispute the retaliation charges by producing evidence of favorable treatment Plaintiffs received after their protected expression. For example, after McCullough's lawsuit was settled, DiNoto assigned to him the position of Commander of Bravo Platoon, which

---

**3.** In the case of Snellbaker, the testimony was provided in deposition, not in the courtroom. The Court finds no reason why deposition testimony ought to be treated differently from courtroom testimony regarding the issue of whether the speech involved is protected by the First Amendment. Deposition testimony implicates the same interests as courtroom testimony, is taken under oath, and furthers the goal of the effective administration of justice.

McCullough admitted was a "very important assignment," *see* Pl. Appendices B at 77. Defendants further contend that after Plaintiffs complained of manpower shortages, they were provided more police officers.

Finally, Defendants attempt to refute that Plaintiffs' complaints regarding the "manpower" shortages would have incited a retaliatory response, by presenting evidence that complaints on this issue were the rule rather than the exception. *See* City's Facts at ¶ 48–49. In fact, McCullough had admitted that the manpower shortages were commonplace and a source of frustration for all captains. *See* City's Facts at ¶ 59. As such criticisms were common, Defendants contend the assertion that Plaintiffs were retaliated against based on these complaints is unworthy of belief.

Despite Defendants' arguments, Plaintiffs have produced sufficient evidence to survive summary judgment. Plaintiffs bring forth evidence that McCullough's transfer to the SHC position occurred within days of his complaints regarding the need for additional police resources, and Snellbaker's transfer to the DO position occurred within weeks of raising OSHA concerns. *See* Pl. Facts at ¶ 26 & ¶ 92. They point to the unusual treatment they received during DiNoto's tenure as Chief, which ceased upon DiNoto's retirement. *See* Pl. Facts at ¶ 48 & ¶ 73 & ¶ 49. Plaintiffs contend that they were subjected to unwarranted investigations under DiNoto's command, and dispute Defendants' evidence that additional officers were ever provided to address Plaintiffs' complaints.

### c. Whether the Adverse Action Would Have Taken Place in the Absence of the Protected Speech

■ Even if Plaintiffs could prove that their protected speech was a motivating factor for adverse employment actions

against them, Defendants could still prevail if they prove that the same employment decisions would have been made even in the absence of protected speech. In light of the disputed issues of fact as to whether Plaintiffs' protected speech was the motivating factor in the allegedly adverse employment actions, the Court also finds there exists disputed issues of material fact as to whether the adverse actions complained of would have taken place in the absence of the protected speech. That being so, Defendants' motion to dismiss Plaintiffs' First Amendment retaliation claim will be denied.

### 3. § 1983 Claim Against Atlantic City

■ In *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local governmental units are included among those "persons" to whom § 1983 applies, and could be sued directly if the governmental unit is alleged to have caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). "§ 1983 also authorizes suit for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels". *Id.* (citing *Monell,* 436 U.S. at 690–691, 98 S.Ct. 2018).

The City, as a municipality, is not liable through respondeat superior for the constitutional torts of its employees. *Id.* (citation omitted). "Municipal liability attaches only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the injury' complained of." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1295 (3d Cir.1997) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). As asserted by the Third Circuit:

> A government policy or custom can be established in one of two ways. Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law.

*Robinson,* 120 F.3d at 1296 (quoting *Andrews,* 895 F.2d at 1480).

Plaintiffs have not submitted evidence that any adverse action taken against them was the result of an "official policy or unofficial custom." Because they have not cited to any official policy that caused their injuries, they must present evidence that a "decisionmaker possess[ing] final authority to establish policy with respect to the action issue[d] an official proclamation, policy, or edict" in order to attach liability to Atlantic City. *See Robinson,* 120 F.3d at 1296.

While Plaintiffs complain of unlawful conduct by Pugh and DiNoto, they fail to produce evidence that, even under the assumption that Defendants had final authority to establish policy with respect to this action, they issued any "official proclamation, policy, or edict," which would make Atlantic City liable. Furthermore, Plaintiffs have produced no evidence that the alleged unlawful conduct was so commonplace or well-settled as to virtually constitute the law.

The evidence in support of Plaintiffs' retaliation claim stems from individual employee conduct, not from any official policy or custom of Atlantic City. Allegations in the Complaint and various deposition testimony show that the alleged adverse employment actions occurred because of DiNoto's personal animus, which arose, at least in part, from Plaintiffs' activities. The Court will therefore dismiss Plaintiffs' § 1983 claims against Atlantic City.

**4. Punitive Damages Against the City Under § 1983**

Insofar as the Court has determined that Atlantic City is not liable for the alleged constitutional violations under § 1983, Atlantic City's motion to dismiss Plaintiffs' claim for punitive damages against Atlantic City is rendered moot. Precedent is clear, however, that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

**5. Individual Liability Under § 1983**

■ "A defendant in [a § 1983] action must have personal involvement in the alleged wrongs." *Robinson,* 120 F.3d at 1294 (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988)). " '[A]ctual knowledge and acquiescence' suffices for supervisory liability because it can be equated with 'personal direction' and 'direct discrimination by the supervisor.' " *Id.* (quoting *Rode,* 845 F.2d at 1207). Mere inaction generally does not give rise to § 1983 liability. *Id.*

Plaintiffs' specific contentions with respect to Pugh's individual liability under § 1983 are that: (1) both the creation of the SHC and DO positions were policy decisions made by him; (2) Pugh acknowledged notice of multiple complaints by Snellbaker in his capacity as DO, yet Pugh did nothing to alleviate the problem; and (3) Pugh acknowledged that no writing was created as to the duties and responsibili-

ties of the SHC's at the time McCullough, Flipping, and another officer were assigned to the position. *See* Pl. Br. at 19. None of these facts establish the "knowledge and acquiescence" required to hold Pugh liable under § 1983.

Plaintiffs mischaracterize the alleged unlawful activities that give rise to their § 1983 claim. They do not contend that the mere existence of the SHC and DO positions violated their constitutional rights. Nor do they claim that the Defendants' failure to provide clear instruction as to their SHC duties violated their constitutional rights. Rather, Plaintiffs' § 1983 action relies on their allegations that they were unlawfully retaliated against through a series of employment actions, the most significant being the transfers and reassignments to positions beneath their levels of qualification and experience. Plaintiffs have failed to bring forth any evidence beyond pure speculation that Pugh was behind the alleged retaliatory acts against them.[4]

Plaintiffs' contention that Pugh knew about Snellbaker's complaints as DO, "yet did nothing to alleviate the problem" also fails to establish § 1983 liability against Pugh. Upon being transferred, Snellbaker had requested that the New Jersey Department of Personnel perform a desk audit on the DO position to determine if his assignment was consistent with the State's job description for Inspector. *See* City's Facts at ¶ 22. The Department determined that the DO assignment was consistent with an inspector's duties pursuant to the State's job description. Since the De-

partment had reaffirmed the appropriateness of the DO transfer, it was not unreasonable for Pugh to take no further action.

Plaintiffs have not produced evidence that tends to show that Pugh had personal involvement in any of the alleged wrongful conduct. DiNoto was in charge of transfers. *See* Pl. Appendix II, James DiNoto Dep. Test. at 40.01–40.04. While Pugh had made requests to DiNoto for particular transfers, none of those requests involved McCullough, Flipping, or Snellbaker. *See* id. at 40.16–40.19. No other claims of retaliation are tied to Pugh. That being so, Plaintiffs' § 1983 claim against Pugh will be dismissed.

### 6. Qualified Immunity Under § 1983

■ Defendants argue that Plaintiffs § 1983 claim against the individual Defendants are barred by the doctrine of qualified immunity.[5]

Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Sharrar v. Felsing,* 128 F.3d 810, 826 (3d Cir.1997); *Orsatti v. New Jersey State Police,* 71 F.3d 480, 483 (3d Cir.1995) (citation omitted). "Government officials, such as police officers, are accorded qualified rather than absolute immunity in order to accommodate two important interests: the officials' interest in

---

4. The process by which the SHC and DO positions were created are certainly relevant to the issue of whether Plaintiffs were reassigned to less desirable positions in retaliation for their constitutionally protected conduct. Who created these positions, however, is not relevant for the purpose of establishing liability for the wrongdoing, unless evidence exists that the positions were created in furtherance

of denying Plaintiffs' their constitutional rights. Plaintiffs have brought forth no evidence of such a conspiracy.

5. Because Defendant Pugh will be dismissed from Plaintiffs' § 1983 action on other grounds, the Court need not decide whether Pugh is immune from suit.

performing their duties without the fear of constantly defending themselves against insubstantial claims for damages, and the public's interest in recovering damages when government officials unreasonably invade or violate individual rights under the Constitution and laws of the United States." *Orsatti*, 71 F.3d at 483 (citing *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The focus of qualified immunity is the "objective legal reasonableness" of the actions taken by the public official. *Pro*, 81 F.3d at 1287 (citing *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034).

In order for a court to address the qualified immunity question, it must first determine that the plaintiff has alleged a violation of a constitutional right. *See Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The right allegedly violated must have been "clearly established" at the time the public official acted. *See Pro*, 81 F.3d at 1287. If the law regarding that right is not "clearly established" when the official acts, he or she is entitled to immunity from suit because he or she could not reasonably be expected to know that the law forbade conduct not previously identified as unlawful. *See id.* (citation omitted).

Here, the right allegedly violated by DiNoto is the First Amendment right to be free from retaliatory action for protected expression. In *Bennis v. Gable*, 823 F.2d 723 (3d Cir.1987), the Third Circuit, in considering the issue of qualified immunity, stated that "as of 1982 the law was clearly established that a public employee could not be demoted in retaliation for exercising his rights under the first amendment," 823 F.2d at 733; *see also, Zamboni*, 847 F.2d at 80 ("Defendants' argument that Zamboni's First Amendment rights were not clearly established at the time the action occurred cannot be sustained in light of this court's line of precedent on public employees' protected speech") (citations omitted). Thus, the First Amendment right at issue here was "clearly established" at all times relevant to this dispute.

The finding that the right at issue is clearly established, or even that the public official clearly violated that established right, does not end the Court's inquiry. *See Orsatti*, 71 F.3d at 483. Even where a Constitutional right has been violated, a police officer will be entitled to immunity where he or she reasonably believed that his or her conduct was lawful. *Id.* (citation omitted). Only if the facts material to the issue of whether the public official acts were objectively reasonably will there be an issue for the jury. *See Sharrar*, 128 F.3d at 828.

In light of the disputed issues of fact as to whether DiNoto's committed the unlawful complained-of conduct, there remains a genuine issue of material fact as to whether DiNoto's actions were objectively reasonable. The Court will therefore deny Defendants' motion to dismiss claims against DiNoto based on qualified immunity.

## B. CEPA CLAIM

Enacted to protect employees from retaliatory actions by employers, the New Jersey CEPA, commonly known as the "whistle-blower" statute, prohibits employers from taking retaliatory action against employees who (1) disclose or threaten to disclose an employer's wrongful or illegal activities, (2) testify before a public body regarding an employer's violation of the law, or (3) object to or refuse to participate in an activity which is unlawful or violates public policy. *See* N.J.S.A. § 34:19–3. "The purpose of CEPA is to protect employees who report illegal or unethical work-place activities. So viewed, CEPA is remedial legislation. Consequently, courts

should construe CEPA liberally to achieve its remedial purpose." *Roach v. TRW, Inc.*, 164 N.J. 598, 754 A.2d 544 (2000) (quoting *Barratt v. Cushman & Wakefield*, 144 N.J. 120, 126, 675 A.2d 1094 (1996)).

█ The analysis of a retaliation claim under CEPA is similar to the analysis under federal discrimination law. *See Blackburn v. United Parcel Service*, 179 F.3d 81, 92 (3d Cir.1999) (citation omitted). First, the plaintiff must make out a prima facie case of retaliatory action. *See id.* To meet this burden, the plaintiff must show:

(1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law;

(2) that he or she performed a whistle-blowing activity described in CEPA;

(3) retaliatory action was taken against him or her; and

(4) a causal connection between the whistle-blowing activity and the adverse employment action.

*Id.* (citations omitted); *see also, Fioriglio v. City of Atlantic City*, 996 F.Supp. 379, 393 (D.N.J.1998) ("To succeed on a CEPA claim, a plaintiff must show (1) that he disclosed or threatened to disclose the activity to a supervisory or public body, (2) that he suffered an adverse employment action, and (3) a causal connection between the two.") (citations omitted). CEPA specifically defines "retaliatory action" as "the discharge, suspension, or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19–2(e); *see Kadetsky*, 82 F.Supp.2d at 340.

█ After the plaintiff meets the prima facie burden, the defendant must articulate a legitimate, nondiscriminatory reason for making the adverse employment decision.

Once defendant produces its reason, the burden shifts back to the plaintiff, who, in order to survive summary judgment, must raise an issue of fact regarding whether the defendant's proffered explanation is pretextual or whether retaliatory discrimination was more likely than not a determinative factor in the decision. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). The employee need not submit direct evidence of discrimination, but must only raise a genuine issue of fact suggesting pretext by providing some evidence establishing a reasonable inference that the employer's proffered reason for the decision was weak, implausible, inconsistent, incoherent or contradictory so as to be unworthy of credence. *Bowles v. City of Camden*, 993 F.Supp. 255, 262 (D.N.J.1998). Summary judgment is improper if the plaintiff points to some evidence that raises doubt about the employer's proffered explanation for the employment decision. *Id.*

█ Similar to the discussion of Plaintiffs' First Amendment Retaliation Claim, temporal proximity of the adverse action to the plaintiff's protected conduct can give rise to an inference of causation. *See id.* (citation omitted). Conversely, the absence of temporal proximity would not necessarily disprove the causal connection. *See Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir.1997). "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and the effect does not disprove causation." *Id.* Thus, even where a plaintiff performs the "whistle-blowing" activity one year before an adverse employment action, a finder of fact "may infer a causal connection based on the surround-

ing circumstances" to find a CEPA violation. *See Roach*, 164 N.J. at 611, 754 A.2d 544. Additionally, animus that allegedly pervaded employment decisions should be considered as evidence of retaliatory conduct in violation of CEPA. *See Regan v. City New Brunswick*, 305 N.J.Super. 342, 351, 702 A.2d 523 (1997).

Plaintiffs' disclosures regarding possible OSHA violations, and Plaintiffs' testimony in other lawsuits regarding unlawful or wrongful actions of the ACPD and/or Atlantic City, are clearly "whistle-blowing" activities under CEPA. In accordance with the remedial purpose of CEPA, the Court finds that Plaintiffs' alleged "constructive demotions" and suspensions amount to adverse employment actions as defined under the statute. Because the discussion regarding Plaintiffs' evidence of retaliation in support of their CEPA claims is similar to the discussion of the First Amendment retaliation claim in Section III.A.2. of this opinion, *supra*, the Court need not reiterate the relevant facts here. There being a genuine issue of material fact as to whether Defendants took adverse employment actions against Plaintiffs in retaliation for "whistleblowing" activities, the Court will deny Defendants' motions for summary judgment on the claim.

## IV. CONCLUSION

For the reasons stated above, Defendant Atlantic City's Motion for Summary Judgment will be granted in part and denied in part. The Court will enter an appropriate order.

## ORDER REGARDING DEFENDANT CITY OF ATLANTIC CITY'S MOTION FOR SUMMARY JUDGMENT and DEFENDANT PUGH'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER having come before the Court on Defendant City of Atlantic City's ("Atlantic City") Motion for Summary Judgment and Defendant George D. Pugh's ("Pugh") Motion for Summary Judgment;

The Court having considered the submissions of the parties; and

For the reasons set forth in the Court's opinion of this date;

**IT IS** on this 21st day of March, 2001, HEREBY

**ORDERED** that the part of Defendants' motion seeking the dismissal of Plaintiffs Joseph P. McCullough, Robert Flipping, III, and Arthur Snellbaker's ("Plaintiffs") 42 U.S.C. § 1983 claim under the Fourteenth Amendment Substantive Due Process Clause is **GRANTED** and that claim is hereby **DISMISSED;**

**AND IT IS FURTHER ORDERED** that the part of Defendants' motion seeking the dismissal of Plaintiffs' 42 U.S.C. § 1983 claim under the First Amendment is **DENIED;**

**AND IT IS FURTHER ORDERED** that the part of Defendants' motion seeking the dismissal of Plaintiffs' 42 U.S.C. § 1983 claim against Defendant Atlantic City is **GRANTED** and that claim against Defendant Atlantic City only is hereby **DISMISSED;**

**AND IT IS FURTHER ORDERED** that the part of Defendants' motions seeking the dismissal of Plaintiffs' 42 U.S.C. § 1983 punitive damages claim against Defendant Atlantic City is **DISMISSED AS MOOT** insofar as the § 1983 claim against Defendant Atlantic City is dismissed;

**AND IT IS FURTHER ORDERED** that the part of Defendants' motions seeking the dismissal of Plaintiffs' 42 U.S.C. § 1983 claim against Defendant Pugh is **GRANTED** and that claim against Defendant Pugh only is hereby **DISMISSED;**

**AND IT IS FURTHER ORDERED** that the part of Defendants' motions seek-

ing the dismissal of Plaintiffs' § 1983 claim against the individual Defendants based on qualified immunity is **DENIED;** and

**AND IT IS FURTHER ORDERED** that the part of Defendants' motions seeking the dismissal of Plaintiffs' claims under the New Jersey's Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq.* ("CEPA"), is **DENIED.**[1]

No costs.

1. The following claims remain in this cause of action: (1) § 1983 claim for retaliation in violation of the First Amendment against Defendant James DiNoto; and (2) CEPA claim against Defendants City of Atlantic City, James DiNoto, and George D. Pugh.