**Robert REILLY**

**v.**

**CITY OF ATLANTIC CITY; Robert Flipping; Joseph B. McCullough; Arthur Snellbaker.**

**Robert Flipping, Appellant.**

**Robert Reilly**

**v.**

**City of Atlantic City; Robert Flipping; Joseph B. McCullough; Arthur Snellbaker.**

Arthur Snellbaker, Appellant.

Nos. 06–2591, 06–2734.

United States Court of Appeals,
Third Circuit.

Argued April 15, 2008.

Filed: July 1, 2008.

A. Michael Barker, Joseph M. Scott, (Argued), Barker, Scott & Gelfand, Linwood, NJ, Eric J. Riso, (Argued), Marrazzo & Platt Stratford, NJ, Attorneys for Appellants.

Frank L. Corrado, (Argued), Barry, Corrado, Grassi & Gibson, Wildwood, NJ, Attorney for Appellee.

Before SLOVITER, JORDAN and ALARCÓN *, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The issue before us is whether we have jurisdiction from the order of the District Court denying Defendants'/Appellants' claim of qualified immunity.

### I.

Appellee Robert Reilly, a former Atlantic City police officer, filed suit against Robert Flipping, the Director of Public Safety, and Arthur Snellbaker, the Chief of Police, claiming that they retaliated against him for his participation, including trial testimony, in an investigation conducted jointly by state and local police a decade earlier. The claimed retaliation consisted of the formal recommendation by Flipping and Snellbaker that Reilly be demoted from his position as sergeant and be suspended for ninety days notwithstanding the recommendation of an independent hearing officer, following an extensive investigation, that Reilly serve a four-day

* Hon. Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

suspension for violating police department regulations. Reilly, who accepted Flipping's offer that he retire as a sergeant instead of being disciplined, then filed this suit claiming that Appellants' actions violated his First Amendment free speech rights and his Fourteenth Amendment right to procedural due process.

The District Court partially denied Appellants' motions for summary judgment. In the procedural posture of this appeal, we cannot decide the merits of Reilly's retaliation claim or of the various defenses thereto put forward by Appellants because we are limited to issues of law underlying the qualified immunity claims. Nonetheless, in deciding the jurisdiction issue, we must necessarily consider Appellants' contention that the District Court erred in holding Reilly's trial testimony was protected by the First Amendment and erred in holding Reilly's allegedly forced retirement gives rise to a claim for the violation of his Fourteenth Amendment right to procedural due process, because these are issues of law underlying Appellants' qualified immunity claims.

## II.

Reilly was an Atlantic City police officer from 1978 until his resignation on June 1, 2003. Flipping, an Atlantic City police officer, was the Director of Public Safety for Atlantic City at the time of Reilly's resignation. Snellbaker, also an Atlantic City police officer, was the Chief of the Atlantic City Police Department at the time that Reilly resigned.

In the late 1980s and early 1990s, while Reilly was a member of the vice and intelligence units, he had a role in several

investigations that targeted Flipping or individuals close to him.[1] The highly publicized investigation of corruption in the Atlantic City Police Department focused on Dennis Munoz, Flipping's friend and colleague. The Munoz investigation was conducted by the state police with the assistance of personnel in the Atlantic City Police Department. One of Reilly's informants, a prostitute named Lori Ann Jones who alleged that Munoz acted as her pimp, provided the basis of the state's case against Munoz. Reilly was called to testify as a witness for the prosecution in the resulting trial. Flipping, who was one of Munoz's supervisors in the vice section, was also a suspect in the investigation but was never charged. Flipping assisted Munoz's defense by providing Munoz's lawyer with information about witnesses against Munoz; he also testified for Munoz at the trial. Flipping was aware that Reilly was involved in the Munoz case and may have heard Reilly's testimony at the trial.

Reilly alleges Snellbaker's animus toward him stems from Snellbaker's dislike of James DiNoto, a former Chief of the Atlantic City Police Department, who was Reilly's mentor in the department. There is some evidence that DiNoto was also involved in the Munoz investigation. Flipping and Snellbaker had contentious relationships with DiNoto. In 1998, they were plaintiffs in a lawsuit alleging retaliation and due process claims against DiNoto, in part based on Flipping's testimony at the Munoz trial. *See McCullough v. City of Atlantic City*, 137 F.Supp.2d 557, 561, 563 (D.N.J.2001). Reilly asserts that after DiNoto was named Chief of Police, Snellbaker, who had authority over Reilly, began

---

1. Reilly was involved in an investigation of allegations of drug dealing and the theft of utility services at a funeral home owned by Flipping's father, and allegedly investigated Flipping for failing to report to work and

altering his time cards. There is no evidence that Flipping was aware of these particular investigations or Reilly's role in any such investigations.

demeaning him in front of other officers. In their depositions, other Atlantic City police officers testified that both Snellbaker and Flipping harbored animosity toward Reilly and refused to promote him. One officer asserted that Flipping was angry with Reilly about his role in the Munoz matter and that Flipping's promotion to Director of Public Safety gave him "his first true opportunity to get even" with Reilly. Flipping App. at 281.

In November 2000, Reilly was charged with engaging in inappropriate conduct toward a subordinate, Officer Kelly Buzby, creating a hostile work environment, making untruthful statements to Internal Affairs, and improperly contacting witnesses. The matter was referred to an independent hearing officer, Willis Flower, a local attorney. Flower held a hearing at which at least twelve persons testified. In a twenty-eight page opinion dated February 14, 2003, Flower made numerous findings of fact and conclusions of law. He dismissed the charges that Reilly had made untruthful statements and improperly contacted witnesses, but found that Reilly had "engaged in conduct which derided and belittled [Buzby] and made offensive, derogatory and sexually explicit comments toward women while in the presence of [Buzby] and other subordinate officers" in violation of the police department's rules and regulations. Flipping App. at 215. Nonetheless, Flower found that "the objective facts of th[e] case, taken in a vacuum, do not present a fair picture of what actually occurred. In short, the surrounding circumstances go a long way to explain and mitigate the literal violations." Flipping App. at 241. Thus, he concluded that "dismissal, reduction in rank or lengthy suspension is not called for here." Flipping App. at 241. Instead, he recommended "a four day suspension without pay" as discipline. Flipping App. at 241.

There is evidence that Snellbaker was displeased that Flower had made a disciplinary recommendation, apparently because he believed that exceeded Flower's role. In a letter to Flipping dated February 24, 2003, Snellbaker emphasized the violations of which Reilly had been found guilty. Significantly, he did not discuss the charges that Flower had dismissed, Flower's disciplinary recommendation, or Flower's explanation of the mitigating circumstances and context of Reilly's behavior. He also did not view Reilly's disciplinary history before making his recommendation. Snellbaker concluded that he could "not overlook the egregious and reprehensible conduct of a superior towards the most impressionable of his subordinates," Flipping App. at 243, and thus he recommended a reduction in rank.

Flipping asserts that he waited for Snellbaker's recommendation before reading the recommendation in the Flower report. After receiving Snellbaker's recommendation, Flipping had the assistant personnel director obtain a copy of what purported to be Reilly's disciplinary history from the City personnel office on February 26, 2003. The City's personnel director testified that the document Flipping relied upon did not look like something prepared by her office. The document Flipping obtained contained substantial inaccuracies, such as the inclusion of a thirty-day suspension which had been rescinded and which nearly tripled the number of days Reilly had actually been suspended. Flipping asserts that he did not know the document was inaccurate at the time he prepared his recommendation.

On March 7, 2003, Flipping sent two letters to the City's Business Administrator. One recommended that Reilly be removed from the promotion list; the other

recommended that he be suspended for ninety days and demoted from sergeant to patrolman. In his letters, Flipping referred to the violations which Flower found Reilly had committed but Flipping omitted mention of the charges against Reilly that Flower had dismissed. One letter stated that Reilly had "exhibited behavior throughout his career that indicates racism, bigotry, sexism, lack of impartiality toward the public, irresponsibility, bringing the department into disrepute, failures to perform lawful duties from competent authority as directed and failures to treat others with respect." Flipping App. at 248. Many of these characterizations appear to have been exaggerated. The only evidence of racism in Reilly's record (which consists of Reilly's unarguably inaccurate disciplinary history) was an allegation from 1979 that Reilly had made remarks of a racial nature.

Although Reilly had not been disciplined or charged with any violations from 1985 until the Buzby incident in 2000, Flipping's letter asserted that this "seeming 'hiatus' during the middle of his career should not mislead anyone into believing that this is a history of unrelated or isolated incidents or that Reilly's behavior has changed or improved.... For reasons unknown (perhaps related to previous administrations' lapse or malaise) no appropriate action was taken against Reilly's insidious behavior." [2] Flipping App. at 248. Flipping did not mention that Reilly's most recent performance evaluation (August 2002) contained his supervisor's highest possible evaluation for his performance and the supervisor's statements that Reilly was first on the list for promotion to captain and that "[t]he

only way Sgt. Reilly's job performance could be improved is promotion." Flipping App. at 296.

Some time after sending his letters to the City's Business Administrator, Flipping informed Reilly's attorney of his disciplinary recommendation. The attorney told Reilly that Flipping would allow him to retire as a sergeant if he retired immediately. After a period of negotiation, on May 30, 2003, Reilly signed a consent agreement providing for his retirement. In his deposition, Reilly explained, "I felt compelled to sign [the agreement] because I just gave up. I threw my arms up, I said I had enough. After being beat down for all those years ... I gave up." Flipping App. at 115. As part of that agreement, Reilly received his pension and a lump sum payment due him.

Shortly thereafter, Reilly filed a lawsuit against the City of Atlantic City, Flipping, Snellbaker, and another police officer, Joseph McCullough.[3] The complaint, filed in part pursuant to 42 U.S.C. § 1983, alleged violation of Reilly's First Amendment right to speak about matters of public concern, his Fourteenth Amendment rights to substantive and procedural due process, conspiracy under 42 U.S.C. § 1985, violation of New Jersey's Conscientious Employee Protection Act ("CEPA"), civil conspiracy, and arbitrary and illegal discipline. The District Court dismissed Reilly's substantive due process claim and his civil conspiracy claim in June 2004, and Reilly settled with McCullough in October 2005.

On April 5, 2006, the District Court granted Appellants' motions for summary judgment on the § 1985 claim. *Reilly v. City of Atlantic City*, 427 F.Supp.2d 507,

---

**2.** Of course, one of the "previous administrations" referred to in Flipping's letter was DiNoto's, with whom Flipping and Snellbaker shared an openly antagonistic relationship. *See generally McCullough,* 137 F.Supp.2d 557.

**3.** McCullough was a co-plaintiff with Flipping and Snellbaker in their 1998 lawsuit against DiNoto. *See generally McCullough,* 137 F.Supp.2d 557.

526 (D.N.J.2006). The District Court also held that Flipping and Snellbaker were entitled to qualified immunity on the procedural due process claim "to the extent the claim [was] based on the theory that the disciplinary decision was based upon evidence not considered by … Flower." *Id.* However, the District Court declined to grant Flipping and Snellbaker qualified immunity on the procedural due process claim to the extent it was "based upon the theory that someone other than the authorized decision maker made the final determination of discipline in Plaintiff's case," and denied the motions for summary judgment in all other respects. *Id.* The District Court denied Snellbaker's motion for reconsideration on May 3, 2006. Snellbaker and Flipping filed timely notices of appeal.

### III.

The District Court had jurisdiction over Reilly's federal civil rights claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and over the pendent state law claims pursuant to 28 U.S.C. § 1367. Our jurisdiction is contested, and will be addressed presently. To the extent that we have jurisdiction, we exercise plenary review over a denial of summary judgment based on a lack of qualified immunity. *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 208 (3d Cir. 2001). We necessarily exercise de novo review over an argument alleging a lack of appellate jurisdiction.

### IV.

Shortly after these appeals were filed, Reilly filed motions to dismiss them for lack of appellate jurisdiction. A motion panel of this court denied those motions. In his appeal briefs, Reilly renews his argument that the appeals should be dismissed for want of jurisdiction.

■ As an initial matter, we consider briefly Snellbaker's contention that Reilly's jurisdictional argument is barred by the law of the case doctrine because the motion panel denied Reilly's earlier motions to dismiss asserting the same jurisdictional argument. Snellbaker relies on our decisions applying the law of the case doctrine to merits issues decided in the course of disposing of prior appeals. *See Africa v. City of Philadelphia (In re City of Philadelphia Litig.)*, 158 F.3d 711, 717–18 (3d Cir.1998); *Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 31–32 (3d Cir.1994). Here, there was no determination of the merits of the motions, merely orders by the motion panel denying Reilly's motions to dismiss which, under our internal operating procedures, must be referred "without decision and without prejudice, to the merits panel." Third Circuit I.O.P. 10.3.5; *cf. Feidt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 130 (3d Cir.1998) (relying on I.O.P. 10.3.5 for analogous proposition that a motion panel granting leave to appeal does not bar a merits panel from examining the court's jurisdiction and subsequently declining to permit the appeal). Although the motion panel did not explicitly refer Reilly's motions to dismiss to the merits panel, its denials of those motions effectively constituted such referrals and do not preclude Reilly from renewing his jurisdictional argument at this time. Therefore, we turn to the merits of that argument.

■ The determination whether a public official is entitled to qualified immunity involves a two-step analysis. First, the court must "decide 'whether a constitutional right would have been violated on the facts alleged….'" *Doe v. Groody*, 361 F.3d 232, 237 (3d Cir.2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "If the answer to that question is 'yes,' we must

then 'consider whether the right was "clearly established."'" *McKee v. Hart,* 436 F.3d 165, 169 (3d Cir.2006) (quoting *Groody,* 361 F.3d at 238). If the answer to that second question is also "yes," then the defendant is not entitled to qualified immunity. *Id.*

Ordinarily, denial of summary judgment would not be a final appealable order, but the Supreme Court has held that "a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law,* is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis added); *see also Blaylock v. City of Philadelphia,* 504 F.3d 405, 408–09 (3d Cir.2007).

 Because the collateral order doctrine which was the basis for the *Forsyth* opinion provides only limited appellate jurisdiction, courts of appeals must determine whether an appeal pursuant to that doctrine presents an issue of law or challenges a district court's conclusion that "there is sufficient record evidence to support a set of facts under which there would be no immunity." *Schieber v. City of Philadelphia,* 320 F.3d 409, 415 (3d Cir.2003) (citing *Johnson v. Jones,* 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). We do not have jurisdiction to review the latter determination. In other words, "for each of [plaintiff's] claims, our jurisdiction to review the District Court's order denying summary judgment depends on whether the defendants' appeal raises pure questions of law or whether it challenges the District Court's determination of which facts were sufficiently supported by evidence." *Blaylock,* 504 F.3d at 409. With respect to facts, "we may review whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right, but we may not consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Forbes v. Twp. of Lower Merion,* 313 F.3d 144, 147 (3d Cir. 2002) (citation and internal quotation marks omitted).

## V.

Reilly alleges that Flipping and Snellbaker retaliated against him for exercising his First Amendment rights in the context of the Munoz investigation and trial. As the District Court succinctly stated, Reilly claims Appellants "severely increased the discipline he was to receive for the sexual harassment incident, which effectively forced his retirement, in retaliation for his participation in the Munoz investigation and trial." *Reilly,* 427 F.Supp.2d at 514. Appellants deny that Reilly had the claimed First Amendment right, an issue of law appropriate for us to consider.

The District Court evaluated Reilly's First Amendment retaliation claim under the following three-step framework: (1) the employee must demonstrate that his/her speech is protected, that is, it addresses a matter of public concern and the "employee's interest in the speech outweighs" the employer's countervailing interest "in promoting workplace efficiency and avoiding workplace disruption" (i.e., the balancing test established in *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); (2) the employee must prove that his/her speech was "a substantial or motivating factor" in the retaliatory action against him/her, which, if proven; (3) shifts the burden to the employer to prove that the "allegedly retaliatory action would have been taken absent the protected [speech]." *Id.* at 514–15 (quoting *Springer v. Henry,* 435 F.3d 268, 275 (3d Cir.2006)).

In undertaking the requisite analysis, the District Court relied on *Baldassare v. New Jersey*, 250 F.3d 188, 195–97 (3d Cir. 2001), in which we held that plaintiff's conduct and expression in an internal investigation of other officers at the Bergen County Prosecutors' Office was a matter of public concern, and *Pro v. Donatucci*, 81 F.3d 1283, 1291 n. 4 (3d Cir.1996), in which we held that "the context of [courtroom testimony] raises the speech to a level of public concern regardless of its content...." The District Court concluded that "Reilly's participation in the internal investigation of alleged criminal wrongdoing within the Atlantic City Police Department is protected by the First Amendment" because he conducted "an official internal investigation" into other officers' alleged criminal wrongdoing and then "testified at the Munoz trial." *Reilly*, 427 F.Supp.2d at 515. The Court held that the *Pickering* balancing favored Reilly because the public's interest in uncovering police corruption outweighed the police department's interest in avoiding disruption in the workplace. *Id.* at 515–16.

Next, the District Court pointed to record evidence suggesting that Flipping sought to prevent Reilly's promotion because of his role in the Munoz case and drew an inference from the facts in the record, including Snellbaker's knowledge of the Munoz case and his dissatisfaction with Flower's recommendation, that Snellbaker conspired with Flipping to retaliate against Reilly for the same reason. *Id.* at 516. Therefore, the Court concluded that Reilly had established a prima facie case of retaliation. The Court further stated that there were material issues of disputed fact about "(a) whether Reilly's increased punishment was substantially motivated by his participation in the Munoz case and (b) whether his increased punishment would have occurred in the absence of his participation." *Id.* (citing *Baldassare*, 250 F.3d

at 195 (stating that determinations under the first step of the retaliation analysis present questions of law for the court, whereas the latter two determinations present questions for the fact finder)).

Having concluded that there was sufficient evidence of a violation of a constitutional right, the Court analyzed whether that right was clearly established. The Court held that Reilly's right to be free from retaliation for speech protected by the First Amendment was clearly established because the situation in *Baldassare* was factually similar to that presented in Reilly's case and *Baldassare* had been decided prior to the retaliatory actions alleged here; thus the Court reasoned that "a reasonable official in Flipping's or Snellbaker's position in 2003 would have understood that increasing Reilly's punishment in retaliation for his participation in the Munoz investigation and trial violated Reilly's First Amendment rights." *Id.*

Approximately two months after the District Court entered the order on appeal here, the Supreme Court issued its decision in *Garcetti v. Ceballos*, 547 U.S. 410, 413, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), considering "whether the First Amendment protects a government employee from discipline based on speech made pursuant to the employee's official duties." Ceballos, a calendar deputy for a branch of the Los Angeles District Attorney's Office, filed suit against the District Attorney and two supervisors, claiming he suffered retaliation for writing a memorandum to his supervisors raising concerns about the accuracy of an affidavit used to support a search warrant. He had also attended a meeting with his supervisors and the warrant affiant regarding the affidavit, and testified at a hearing after being called by the defense. *Id.* at 413–15, 126 S.Ct. 1951. Asserting that he was subjected to a series of retaliatory employment

actions, Ceballos filed a claim under 42 U.S.C. § 1983, alleging that his employer "violated the First and Fourteenth Amendments by retaliating against him based on his memo...." *Id.* at 415, 126 S.Ct. 1951.

In its opinion, the Supreme Court distinguished between employee speech and citizen speech. The Court recognized that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* at 417, 126 S.Ct. 1951. On the other hand, the Court stated that it was necessary to limit government employees' freedom because employers "need a significant degree of control over their employees' words and actions," *id.* at 418, 126 S.Ct. 1951, and government employees, "[w]hen they speak out, ... can express views that contravene governmental policies or impair the proper performance of governmental functions," *id.* at 419, 126 S.Ct. 1951. Emphasizing the distinction, the Court explained that "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The Court also recognized that "the First Amendment interests at stake extend beyond the individual speaker. The Court has acknowledged the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Id.* Therefore, the Court explained that its decisions "have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Id.* at 420, 126 S.Ct. 1951 (citing

*Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

Applying these principles to the case before it, the Court stated that the "controlling factor" was that Ceballos prepared the memo "pursuant to his duties as a calendar deputy." *Id.* at 421, 126 S.Ct. 1951. The Court emphasized the importance of this fact, because by writing the memo "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case...." *Id.* The Court held that under these circumstances, restricting the speech contained in Ceballos' memo "does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)). It also noted that in appropriate circumstances, the supervisor could take "corrective action." *Id.* at 423, 126 S.Ct. 1951. The Court compared the preparation of the memo to Ceballos' other "daily professional activities, such as supervising attorneys, investigating charges, and preparing filings," each of which Ceballos performed as a government employee. *Id.* at 422, 126 S.Ct. 1951. It distinguished such tasks from "contributions to the civic discourse," which "retain the prospect of constitutional protection" for the speaker. *Id.* The Court concluded, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail." *Id.* at 424, 126 S.Ct. 1951.

■ Flipping and Snellbaker argue that under *Garcetti* they are entitled to quali-

fied immunity on Reilly's First Amendment claim as a matter of law because Reilly's speech in the Munoz case was made pursuant to his official duties, and thus that speech was not protected by the First Amendment. In *Garcetti*, the Supreme Court described the inquiry into whether the plaintiff spoke pursuant to his official duties as "a practical one," noting that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424–25, 126 S.Ct. 1951. In that case, however, the parties "d[id] not dispute that Ceballos wrote his disposition memo pursuant to his employment duties." *Id.* at 424, 126 S.Ct. 1951.

Consistent with *Garcetti*, we thereafter held that "whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir.2007). In *Foraker*, we agreed with the district court's decision that Delaware state policemen who were disciplined for complaining to the State Auditor about hazardous conditions at a firing range spoke pursuant to their duties

as government employees; we therefore applied *Garcetti* to foreclose their First Amendment claims. We noted that the district court had already considered whether the plaintiffs' speech was pursuant to their official duties, and we commented that "the proper resolution of challenges to the designation of such speech is to defer to the district court, because 'having presided over this and related litigation for several years, [the district court] may be in a better position to make the relevant factual determinations....'" *Id.* at 240–41 (quoting *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir.2006), *cert. denied*, —— U.S. ——, 127 S.Ct. 1918, 167 L.Ed.2d 567 (2007)).

In the case before us, there was no argument, let alone fact finding, by the District Court as to whether Reilly's speech was made pursuant to his official duties. Although Flipping argues that Reilly has conceded that he was acting pursuant to his official duties,[4] Reilly disputes this characterization, particularly with respect to his trial testimony. Therefore, Reilly argues that the question whether he engaged in speech pursuant to his official duties presents a factual issue that is not cognizable under the collateral order doctrine. We agree that some aspects of Reilly's speech in the context of the Munoz investigation require further

---

**4.** Flipping's argument is premised on a single exchange from Reilly's deposition during the District Court proceedings:

[Q.] Did you tell Flipping, in that conversation in the Detective Bureau, I did what I did because it was my job, I was ordered to do it, I'm doing my job—I did my job?
A. That was the—you know, that was the context of the conversation.
Q. That is a fair summation of what thought you transmitted to Mr. Flipping, correct?
A. Yeah.
And what I received back from him was—the only thing he was concerned about was

it wasn't our job to do it, you shouldn't have been involved, you know.
Flipping App. at 133. Because the page immediately preceding the passage reproduced here has not been included in the appendix, it is not entirely clear which aspects of Reilly's speech he agreed were part of his job. Moreover, this passage suggests that Flipping disagreed with Reilly as to whether Reilly's actions were in fact part of his official responsibilities. Finally, Reilly was speaking as to what he told Flipping, rather than what he believed.

factual development by the District Court. On the other hand, the fact of Reilly's sworn testimony at the Munoz trial is sufficiently developed on this appeal for us to consider as a matter of law whether that speech was made "pursuant to [his] official duties," *Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951, so as to foreclose his retaliation claim, or whether that speech entitled Reilly to the protections of the First Amendment.

In analyzing Reilly's retaliation claim, the District Court asked whether Reilly's speech involved a matter of public concern and whether the *Pickering* balancing weighed in favor of Reilly. See *Reilly,* 427 F.Supp.2d at 514–15 (citing *Springer,* 435 F.3d at 275). We have stated that following *Garcetti,*

> [a] public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" as a result of the statement he made [i.e., the *Pickering* balancing test].

*Hill v. Borough of Kutztown,* 455 F.3d 225, 241–42 (3d Cir.2006) (quoting *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951). *Garcetti* simply "narrowed the Court's jurisprudence in the area of employee speech" by further restricting the speech activity that is protected. *Foraker,* 501 F.3d at 241. Here, the District Court concluded that Reilly's speech was a matter of public concern and that the *Pickering* balancing favored Reilly. See *Reilly,* 427 F.Supp.2d at 515. Therefore, the effect of *Garcetti* in the context of this appeal is limited to the question whether Reilly spoke as a citizen when he testified at the Munoz trial.

It is axiomatic that "[e]very citizen ... owes to his society the duty of giving testimony to aid in the enforcement of the law." *Piemonte v. United States,* 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 6 L.Ed.2d 1028 (1961); *accord United States v. Mandujano,* 425 U.S. 564, 576, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (recognizing that "the duty to give testimony" is an "obligation imposed upon all citizens"); *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("The duty to testify has long been recognized as a basic obligation that every citizen owes his Government."); *New York v. O'Neill,* 359 U.S. 1, 11, 79 S.Ct. 564, 3 L.Ed.2d 585 (1959) ("A citizen cannot shirk his duty, no matter how inconvenienced thereby, to testify in criminal proceedings and grand jury investigations in a State where he is found."); *Blackmer v. United States,* 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932) ("It is ... beyond controversy that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned."); *Blair v. United States,* 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979 (1919) ("[I]t is clearly recognized that the giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the Government is bound to perform upon being properly summoned....").

The Supreme Court has relied on this principle in rejecting attempts by citizens, regardless of their role in our society, to circumvent their obligation to comply with judicial process. For instance, in *Branzburg v. Hayes,* 408 U.S. 665, 686, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Court noted that the great weight of authority held that the so-called newsman's privilege "was outweighed by the general obligation of a citizen to appear before a grand jury

or at trial ... and give what information he possesses." Therefore, the Court concluded:

> we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, *like other citizens,* respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

*Id.* at 690–91, 92 S.Ct. 2646 (emphasis added). Similarly, in *United States v. Nixon,* 418 U.S. 683, 708, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the Court decided that the "presumptive privilege for Presidential communications" is not unyielding because every citizen has a duty to comply with the rule of law. The Court explained:

> The need to develop all relevant facts in the adversary system is both fundamental and comprehensive.... The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

*Id.* at 709, 94 S.Ct. 3090. The notion that all citizens owe an independent duty to society to testify in court proceedings is thus well-grounded in Supreme Court precedent.

We have acknowledged the importance of this same principle when evaluating First Amendment retaliation claims. In *Pro v. Donatucci,* we considered whether Pro, an employee in the office of the Clerk of the Orphans' Court, could state a claim against Donatucci, the Register of Wills of Philadelphia County, on the basis that Pro's employment was terminated shortly after she appeared in court pursuant to a subpoena to testify for Donatucci's wife in a divorce action against Donatucci. 81 F.3d at 1285. In accord with a line of cases from the Court of Appeals for the Fifth Circuit, we concluded that "Pro had a First Amendment right to respond to Mrs. Donatucci's subpoena to appear at the divorce proceeding." *Id.* at 1290.

We found persuasive the reasoning of our sister court that "it is the duty of every person to testify truthfully before a duly constituted tribunal" and that "these values, along with the first amendment values, would not be served if the fear of retaliation and reprisal effectively muzzled witnesses testifying in open court." *Id.* (quoting *Reeves v. Claiborne County Bd. of Educ.,* 828 F.2d 1096, 1100 (5th Cir. 1987) (internal quotation marks and alterations omitted)). We also found persuasive that court's reasoning that testimony is offered "in a context that is inherently of public concern.... Employees either could testify truthfully and lose their jobs or could lie to the tribunal and protect their job security." *Id.* (quoting *Johnston v. Harris County Flood Control Dist.,* 869 F.2d 1565, 1578 (5th Cir.1989)). We reserved the question whether Pro's speech would have been protected "if she had appeared voluntarily" in court. *Id.* at 1291 n. 3.

A year later, we answered the question reserved in *Pro. See Green v. Philadelphia Housing Auth.,* 105 F.3d 882, 887 (3d Cir. 1997). In that case, Green, a police officer for the Philadelphia Housing Authority Police Department, was transferred from a special unit within the department to regular patrol duty after he voluntarily appeared as a witness at the bail hearing of a longtime friend's son. *Id.* at 884. Although Green refused to testify at the hearing after learning that the charges

against his friend's son included organized crime activity, he was nonetheless transferred from the special unit after an unidentified officer notified the special unit's captain that Green had appeared as a character witness for a member of a crime organization. *Id.* We concluded that "there is a compelling reason to find Green's appearance to be a matter of public concern regardless of its voluntary nature. That reason, of course, is the integrity of the truth seeking process." *Id.* at 886. We elaborated, "[t]he utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for appearance and truthful testimony at such proceedings." *Id.* at 887.

Many courts of appeals have joined this court and the Court of Appeals for the Fifth Circuit in recognizing the fundamental role in-court testimony plays in our society and its importance to the question whether a public employee's speech is protected by the First Amendment. *See, e.g., Herts v. Smith,* 345 F.3d 581, 586 (8th Cir.2003) ("Subpoenaed testimony on a matter of public concern in ongoing litigation ... can hardly be characterized as defeating the interests of the state.... Dr. Herts's speech therefore qualifies as protected speech."); *Catletti ex rel. Estate of Catletti v. Rampe,* 334 F.3d 225, 229–30 (2d Cir.2003) ("In this case the context of Catletti's speech—testimony offered at a trial—is significant.... The paramount importance of judicial truth-seeking means that truthful trial testimony is almost always of public concern."); *Worrell v. Henry,* 219 F.3d 1197, 1204–05 (10th Cir.2000) ("[T]ruthful testimony is protected by the First Amendment and ... a government employee may not be fired or subjected to other adverse action as a result of such testimony."); *Wright v. Ill. Dep't of Children & Family Servs.,* 40 F.3d 1492, 1505 (7th Cir.1994) (holding that "an employee summoned to give sworn testimony ... has a compelling interest in testifying *truthfully* and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases"); *cf. Robinson v. Balog,* 160 F.3d 183, 189 (4th Cir.1998) ("By responding to the Board's invitation to testify at a public hearing and by cooperating with law enforcement investigators, Robinson and Marc spoke not in their capacity as ... public employee[s], but as citizen[s] upon matters of public concern.") (citations and internal quotation marks omitted).

Despite the overwhelming weight of authority concluding that an employee's truthful testimony in court is protected by the First Amendment, we are aware of no precedential appellate decision after *Garcetti* answering the question whether truthful trial testimony arising out of the employee's official responsibilities constitutes protected speech.[5] Only one federal appellate court has issued a precedential opinion even touching upon this issue. Specifically, the Court of Appeals for the Seventh Circuit concluded that a police officer's subpoenaed civil deposition testimony "was unquestionably not ... part of what he was employed to do," and thus it was protected even though the officer testified about speech that was made pursuant to his official duties. *Morales v. Jones,* 494 F.3d 590, 598 (7th Cir.2007); *see also Fairley v. Fermaint,* 482 F.3d 897, 902 (7th Cir.2007) (noting that *Garcetti* did not apply to testimony given by county jail

---

**5.** The Court of Appeals for the Seventh Circuit recently held that a plaintiff's testimony at a legislative hearing was not protected because it "was given as an employee and not as a citizen...." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1092 (7th Cir.2008). That issue is distinct from the one before us on appeal.

guards in inmate lawsuits because assisting prisoners in their litigation did not fall within the guards' official duties).

Here, however, Reilly, as an Atlantic City police officer, assisted a state investigation of a fellow officer and testified for the prosecution at the subsequent trial. Thus, the speech at issue on this appeal, Reilly's trial testimony, appears to have stemmed from his official duties in the investigation. The *Garcetti* opinion focused solely on the speech contained in Ceballos' internal memo, leaving to the court of appeals on remand the opportunity to consider whether Ceballos' conduct at the meeting and his testimony in court were entitled to First Amendment protection. 547 U.S. at 443–44, 126 S.Ct. 1951 (Souter, J., dissenting). In his dissent, Justice Souter recognized that these issues were not decided by the *Garcetti* majority, and cautioned that "the claim relating to truthful testimony in court must surely be analyzed independently to protect the integrity of the judicial process." *Id.* at 444, 126 S.Ct. 1951 (Souter, J., dissenting).

Because *Garcetti* offers no express instruction on the application of the First Amendment to the trial testimony of a public employee, we turn to the settled principles discussed above: "[t]he duty to testify has long been recognized as a basic obligation that *every citizen* owes his Government." *Calandra,* 414 U.S. at 345, 94 S.Ct. 613 (emphasis added). The citizen's obligation to offer truthful testimony in court is necessary to protect the integrity of the judicial process and to insulate that process from outside pressure. *See Green,* 105 F.3d at 887 ("The utility of uninhibited testimony and the integrity of the judicial process would be damaged if we were to permit unchecked retaliation for . . . truth-

ful testimony at such proceedings."); *cf. Nixon,* 418 U.S. at 709, 94 S.Ct. 3090 ("The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts."). Much as the duty to testify is not vitiated by one's role as a newsman, *see Branzburg,* 408 U.S. at 690–91, 92 S.Ct. 2646, or as the President of the United States, *see Nixon,* 418 U.S. at 709, 94 S.Ct. 3090, the citizen's obligation to testify truthfully is no weaker when one is employed by the government in any other capacity. Thus, the act of offering truthful testimony is the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee. That an employee's official responsibilities provided the initial impetus to appear in court is immaterial to his/her independent obligation as a citizen to testify truthfully.

■■■ When a government employee testifies truthfully, s/he is not "simply performing his or her job duties," *Garcetti,* 547 U.S. at 423, 126 S.Ct. 1951; rather, the employee is acting as a citizen and is bound by the dictates of the court and the rules of evidence. Ensuring that truthful testimony is protected by the First Amendment promotes "the individual and societal interests" served when citizens play their vital role in the judicial process. *Id.* at 420, 126 S.Ct. 1951. Thus, the principles discussed in *Garcetti* support the need to protect truthful testimony in court.

Having concluded that Reilly's truthful testimony in court constituted citizen speech and that his claim is not foreclosed by the "official duties" doctrine enunciated in *Garcetti,*[6] we briefly address Appellants'

---

**6.** As discussed in *Pro,* "[w]e have not held that courtroom testimony should receive 'absolute' First Amendment protection." 81

F.3d at 1291 n. 4. Rather, courtroom testimony meets the threshold inquiry that speech be on a matter of public concern and, as we now

three remaining challenges to the District Court's order denying them qualified immunity on Reilly's First Amendment retaliation claim.

▉ First, Appellants argue that even if Reilly's speech may be protected by the First Amendment, that fact was not clearly established until the Supreme Court's decision in *Garcetti*, and therefore they are entitled to qualified immunity as a matter of law. This contention is without merit. The protected status of courtroom testimony was clearly established even at the time we decided *Pro*.[7] 81 F.3d at 1291–92. As we have explained in this opinion, *Garcetti* does not alter that conclusion. *Cf. Foraker*, 501 F.3d at 241 (commenting that *Garcetti* simply "narrowed the Court's jurisprudence in the area of employee speech").

▉ Second, Snellbaker argues that Reilly is not entitled to First Amendment protection for his speech in the Munoz matter because his right to speak was outweighed by the police department's interest in disciplining Reilly for creating a hostile work environment. Because the *Pickering* balancing analysis presents a question of law, *see Baldassare*, 250 F.3d at 195, we have jurisdiction over this issue pursuant to the collateral order doctrine to the extent that it challenges the District Court's legal conclusions.

▉ Reilly does not dispute that he was subject to discipline for the findings in the Flower report; rather, he argues that Flipping and Snellbaker used that occasion to punish him more severely than warranted (i.e., by increasing the recommended four-day suspension to a ninety-day suspension and demotion) in retaliation for his speech in the Munoz matter, including his testimony at trial. Where a plaintiff claims that the stated grounds for his/her discipline were a pretext for the discipline imposed, the court does not apply the *Pickering* balancing test solely to the speech that defendants claim motivated the disciplinary action, *see Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1367–68 (3d Cir.1993), such as Reilly's violation of department regulations here. Rather, the court considers all of the speech that the plaintiff alleges is protected, *id.*, such as Reilly's testimony at the Munoz trial. With respect to the speech that is the basis of Reilly's retaliation claim, the District Court properly held that the public's interest in hearing testimony about police corruption outweighed Appellants' interest in maintaining order by disciplining Reilly for that speech.

To the extent that Snellbaker attempts to argue that his disciplinary recommendation was justified by Reilly's violations and was in no way connected to Reilly's speech in the Munoz matter, his argument is more

---

hold, be offered in one's capacity as a citizen. Nonetheless, that conclusion does not end our analysis; rather, "[t]he interests of the employee in speaking and the employer in regulating the speech must then be balanced against one another, as in any First Amendment balancing context. . . ." *Id.* Therefore, our holding today does not obviate the need to engage in *Pickering* balancing. We address that balancing here to the extent that Appellants properly challenge the District Court's analysis of that issue.

7. In fact, when Flipping and Snellbaker sued DiNoto in 1998, the district court relied on *Pro* and *Green* for the proposition that "the testimonies" they provided in the Munoz trial and other "judicial proceeding[s] are automatically of a public concern because, as in *Green*, they implicate the judicial and public interest in the integrity of the truth seeking process and the effective administration of justice." *McCullough*, 137 F.Supp.2d at 568. This further undermines their contention that the protected status of Reilly's speech in that same trial was not clearly established when they allegedly retaliated against him in 2003.

properly viewed as a challenge to the factual issues of motivation and rebuttal. *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 404–05 (3d Cir.2006) (whether "conduct violated clearly established law depended upon [defendant's] motivation" for alleged retaliation and there was sufficient evidence of motive to go to a jury). The District Court concluded that there was sufficient evidence to present these issues to the jury, and we do not have jurisdiction over that determination pursuant to the collateral order doctrine.

Moreover, Snellbaker provides no compelling support for his argument that the law was not clearly established in this area. The *Pickering* balancing test was clearly established at the time of the alleged retaliation, as was the notion of pretextual discipline in the context of a First Amendment retaliation claim. *See, e.g., Latessa v. N.J. Racing Comm'n*, 113 F.3d 1313, 1320 (3d Cir.1997) (considering whether employer's stated justification for non-renewal of plaintiff's employment was "mere pretext"). Therefore, we reject Snellbaker's argument to the extent that it raises a legal issue over which we may exercise jurisdiction on this appeal.

Third, Snellbaker argues that the District Court erred in leaving for the jury the question whether there was a causal connection between Reilly's speech in the Munoz matter and any alleged adverse employment action by Snellbaker. He argues that this is a legal issue and that the length of time between Reilly's speech in the Munoz matter and the allegedly retaliatory actions forecloses the possibility of a First Amendment violation here. But the precedents upon which Snellbaker relies focus on whether timing alone is sufficient to draw an inference of retaliation. *See, e.g., Estate of Smith v. Marasco*, 318 F.3d 497, 512–13 (3d Cir.2003); *Brennan v. Norton*, 350 F.3d 399, 420 (3d Cir.2003).

Here, the District Court relied on evidence in addition to timing; specifically, it drew an inference from the evidence that Snellbaker was aware of Reilly's role in the Munoz investigation, that he was frustrated by Flower's disciplinary recommendation, and that he conspired with Flipping to force Reilly into retirement. *Reilly*, 427 F.Supp.2d at 516. The facts identified by the District Court were sufficient to establish a prima facie case against Snellbaker. We may not further "consider whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Forbes*, 313 F.3d at 147 (citation and internal quotation marks omitted).

In summary, we conclude that the District Court appropriately denied Appellants' motions for summary judgment on the basis of qualified immunity with respect to Reilly's First Amendment retaliation claim.

## VI.

Flipping and Snellbaker also challenge the District Court's order denying them qualified immunity on Reilly's procedural due process claim. The District Court framed the issue presented by that claim as "whether Reilly was afforded an appropriate level of pre-deprivation procedural due process before the decision to increase his punishment from a 4–day suspension to a 90–day suspension, a reduction in rank, and removal from the promotion list." *Reilly*, 427 F.Supp.2d at 517.

The District Court considered two separate theories of liability: (1) that Flipping relied on Reilly's disciplinary history without giving Reilly notice and an opportunity to rebut that evidence; and (2) that the final disciplinary decision in Reilly's case was made by an individual without authority to make that decision. *See id.* at 518–20. The District Court concluded that

Flipping and Snellbaker were entitled to qualified immunity on the first theory of liability because at the time of Flipping's letters this court had not decided that a government employee was entitled to the opportunity to respond to a punishment decision, a determination we made in 2005. *Id.* at 520–21. That issue is not before us on this appeal. Instead, we limit our discussion to the process accorded by New Jersey's regulatory scheme.

Under the procedure for "major discipline" of civil servants set forth in the New Jersey Administrative Code, *see* N.J. Admin. Code §§ 4A:2–2.1 to .12, "[a]n employee must be served with a Preliminary Notice of Disciplinary Action setting forth the charges and statement of facts supporting the charges (specifications), and afforded the opportunity for a hearing prior to imposition of major discipline," *id.* § 4A:2–2.5(a). Such a hearing "shall be held before the appointing authority or its designated representative." *Id.* § 4A:2–2.6(a). "Within 20 days of the hearing, or such additional time as agreed to by the parties, the appointing authority shall make a decision on the charges and furnish the employee either by personal service or certified mail with a Final Notice of Disciplinary Action." *Id.* § 4A:2–2.6(d). The employee may then appeal the Final Notice of Disciplinary Action to the Merit System Board, *id.* § 4A:2–2.8, and may request a hearing from that body, *id.* § 4A:2–2.9.

Instead of reviewing the post-deprivation process that would have been available to Reilly had he appealed the disciplinary decision in his case, the District Court focused on "who ha[d] authority to make the final disciplinary decision, and who actually made the decision in Reilly's case." *Reilly,* 427 F.Supp.2d at 519. Because Flipping and Snellbaker had different theories as to who had the final disciplinary authority, the District Court concluded:

> questions of fact exist as to whether the person with legal authority to make the final discipline decision was actually the person to make the decision in Reilly's case. If Reilly is able to prove at trial that someone other than the person vested with authority to make final discipline decisions made the decision as to his discipline, he will have proven a procedural due process violation.

*Id.* at 520 (citing *Sarteschi v. Burlein,* 508 F.2d 110, 115 n. 7 (3d Cir.1975)).

■■■■■ "A decision on qualified immunity ... 'will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis.'" *Wright v. City of Philadelphia,* 409 F.3d 595, 599 (3d Cir.2005) (quoting *Curley v. Klem,* 298 F.3d 271, 278 (3d Cir.2002)). Nonetheless, deciding the issue of qualified immunity at the summary judgment stage may be appropriate and is "reviewable on appeal where the dispute does not turn upon 'which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of "clearly established" law.'" *Id.* (quoting *Johnson v. Jones,* 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)). In conducting this inquiry, courts are not confined to the allegations of the complaint, but instead may "analyz[e] the evidence adduced by plaintiff as to the conduct of the defendants." *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (citing *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Flipping and Snellbaker argue that because Reilly resigned before the Mayor or his designee took any action whatsoever, Reilly effectively abandoned the process available to him, primarily the right to appeal any such action to the Merit System Board, and cannot now claim that he was deprived of

legal process. Having reviewed the record before us and the relevant precedents, we conclude that Appellants are correct on that issue.

In *Alvin v. Suzuki*, 227 F.3d 107, 110 (3d Cir.2000), Alvin, a tenured professor at the University of Pittsburgh, brought a civil rights action alleging that the university's administrators denied him the rights inhering in his tenure. We rejected Alvin's procedural due process claims on the ground that he failed to follow the grievance procedures set forth in the faculty handbook. *Id.* at 111. We explained, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Id.* at 116. We carefully distinguished this requirement from exhaustion, explaining that taking advantage of available processes is not a procedural hurdle, but is akin to an element of the claim because "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Id.*

We also rejected Alvin's argument that his use of formal procedures would have been futile. We acknowledged that "[w]hen access to procedure is absolutely blocked or there is evidence that the procedures are a sham, the plaintiff need not pursue them to state a due process claim." *Id.* at 118. Applying that standard to the facts presented, we stated, "since Alvin never invoked the second part of the processes available to him, which appear facially adequate, we will not hold that this step would have been unavailing (in procedure, if not in substance), absent concrete evidence supporting such a contention." *Id.* We concluded that Alvin could not "forego attempting to use [the bypassed]

processes simply because he thinks that they will be followed in a biased manner." *Id.* at 119. We further explained that an allegation of biased pre-deprivation procedures is insufficient to prove futility in "the presence of ... apparently adequate post-termination remedies...." *Id.* (citing *McDaniels v. Flick*, 59 F.3d 446, 460–61 (3d Cir.1995)).

*McDaniels* is equally instructive. McDaniels was a tenured professor at Delaware County Community College. *McDaniels*, 59 F.3d at 448. The college's board of trustees voted to terminate McDaniels' employment after an allegedly biased pre-termination hearing, but McDaniels did not appeal to or ask for a hearing before the board of trustees as required by the college's regulations. *Id.* at 451–53. We denied McDaniels' procedural due process claim, holding:

> a discharged employee cannot claim in federal court that he has been denied due process because his pretermination hearing was held by a biased individual where he has not taken advantage of his right to a post-deprivation hearing before an impartial tribunal that can rectify any possible wrong committed by the initial decisionmaker.

*Id.* at 460.

Here, the disputed issue of fact identified by the District Court, "whether the person with legal authority to make the final discipline decision was actually the person to make that decision in Reilly's case," *Reilly*, 427 F.Supp.2d at 520, is immaterial to whether Reilly may state a procedural due process claim where he resigned from the police department instead of using the post-deprivation procedures available to him. Those procedures entailed invoking Reilly's statutory right to appeal a Final Notice of Disciplinary Action to the Merit System Board and to

request a hearing from that body. *See* N.J. Admin. Code §§ 4A:2–2.8 to .9.

Reilly does not allege, nor has he produced evidence, that the Merit System Board was biased against him, unavailable, or patently inadequate. He completely ignores the existence of statutory post-deprivation procedures that serve as a counterbalance to any discipline imposed on New Jersey civil servants, such as that allegedly imposed by Flipping and Snellbaker. Reilly does not provide any authority for the proposition that a civil servant may state a valid due process claim where s/he has resigned before taking advantage of any post-deprivation procedures available. Nor do *Sarteschi* or *Gilbert v. Homar*, 520 U.S. 924, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997), both of which were relied upon by the District Court, support Reilly's position.

Although *Sarteschi* asserts the uncontroversial proposition that a procedural due process right arises to protect one's expectation of proper procedures before discharge, that decision says nothing about a plaintiff's obligations to follow post-deprivation procedures before filing suit for an alleged violation of his/her right to pre-deprivation procedures. 508 F.2d at 115 n. 7. Thus, *Sarteschi* does not conflict with *Alvin.* The constitutional right to process does not permit one to forego post-deprivation procedures that may remedy any defect in the initial procedures without demonstrating that the post-deprivation procedures are inadequate.

*Gilbert* is equally unavailing. In that decision, the Supreme Court explained that pre-deprivation process is not invariably required. 520 U.S. at 930, 117 S.Ct. 1807 ("This Court has recognized, on many occasions, that where a State must act

quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause."). Therefore, defendant, a university police officer who had been charged with a felony, was not entitled to a hearing before being suspended, *id.* at 933, 117 S.Ct. 1807, because "in the case of a suspension there will be ample opportunity to invoke [the decision-maker's] discretion later," *id.* at 934–35, 117 S.Ct. 1807. The Court then addressed the distinct question whether defendant "was provided an adequately prompt *post*-suspension hearing...." *Id.* at 935, 117 S.Ct. 1807.

Rather than supporting the proposition that a pre-deprivation procedure may be challenged without consideration of any available post-deprivation procedures, *Gilbert* makes clear that the availability and validity of any pre-deprivation process must be analyzed with reference to the context of the alleged violation and the adequacy of available post-deprivation procedures. Reilly did not attempt to invoke any of the post-deprivation procedures available to him, nor does he contest their adequacy. Therefore, he cannot state a valid procedural due process claim as a matter of law.

In summary, we will reverse the District Court's order that Appellants are not entitled to qualified immunity at the summary judgment stage with respect to Reilly's Fourteenth Amendment procedural due process claim.[8] Because Reilly cannot state a claim under the Fourteenth Amendment, defendants are entitled to qualified immunity.

## VII.

Finally, Appellants ask us to reverse the District Court's decision denying

---

**8.** In light of our holding that Flipping and Snellbaker are entitled to summary judgment on the procedural due process claim, we need

not discuss Appellants' remaining arguments for reversal of the District Court's decision on this count.

them summary judgment on Reilly's CEPA claim and his claim for punitive damages. The courts of appeals may exercise pendent appellate jurisdiction "over issues that are not independently appealable but that are intertwined with issues over which the appellate court properly and independently exercises its jurisdiction." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 202–03 (3d Cir. 2001) (citations omitted).

Snellbaker argues that Reilly's CEPA claim is intertwined with his First Amendment claim because the District Court denied summary judgment on the CEPA claim for the same reasons that it denied summary judgment on the First Amendment claim.[9] We have concluded that the District Court properly denied Appellants summary judgment on Reilly's First Amendment claim. *See supra* Part V. Therefore, to the extent that Reilly's CEPA claim may be intertwined with his First Amendment claim, we would affirm the District Court's denial of summary judgment.[10]

Flipping argues that Reilly's punitive damages claim is intertwined with his First and Fourteenth Amendment claims because if the court finds that Appellants are entitled to qualified immunity on those claims, there would be no outrageous conduct on which to base punitive damages under 42 U.S.C. § 1983. However, because we have concluded that the District Court's denial of summary judgment on the First Amendment claim should be affirmed, Flipping's argument would fail

even if we exercised pendent appellate jurisdiction over the punitive damages issue.

In summary, we decline to exercise pendent appellate jurisdiction over the remaining arguments raised by Flipping and Snellbaker on this appeal.

## VIII.

For the reasons set forth, we will affirm the District Court's denial of summary judgment with respect to the First Amendment retaliation claim and reverse the denial of summary judgment with respect to the Fourteenth Amendment due process claim.

---

**9.** Flipping made a similar argument regarding the CEPA claim in his principal appellate brief, but withdrew that argument in his reply brief.

**10.** We do not decide that the CEPA claim is sufficiently intertwined with the First Amend-

ment claim to exercise pendent appellate jurisdiction over the former. We only decide that our affirmance of the latter would require affirmance of the former if those claims were in fact sufficiently intertwined to invoke our jurisdiction.